UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MARION BAECHLE,                    )      CASE NO. 1:09 CV 217
                                   )
                Plaintiff,         )
                                   )
        v.                         )      MAGISTRATE JUDGE McHARGH
                                   )
                                   )
ENERGIZER BATTERY                  )
MANUFACTURING, INC.,               )
                                   )      **OPINION AND ORDER**
                Defendant.         )

Before the court is Defendant Energizer's motion for summary judgment on Plaintiff Marion

Baechle's federal and state law claims for age discrimination under the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C.  § 621 *et seq.*, and Ohio Revised Code § 4112, respectively,

and Plaintiff's interference claim under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §

2614(a).  For the following reasons, Defendant's motion (doc. 21) is GRANTED.

**I.  FACTS AND BACKGROUND**[1]

Plaintiff began employment with Energizer, known at that time as Union Carbide, in 1967.

_____

[1]In its Case Management Conference Order, the court instructed that "[i]f a motion for
summary judgment is filed, the moving party shall also filed a certificate of uncontested facts
with the Court" and that "[a] party opposition the motion for summary judgment challenging an
uncontested fact must specifically identify the fact contested." (Doc. 14, at 2).  The Court also
indicated that "[a]ny fact that is not contested shall be deemed admitted."  (Doc. 14, at 2).
        It was intended that these requirements might result in a narrowing of the issues, thereby
allowing counsel to focus their respective arguments and facilitate the court's review.  What
occurred, however, was a fairly unhelpful exchange regarding many so called "factual issues",
which had little or no import in addressing the claims at bar.  While the court is surprised at this
outcome, given the obvious skill and experience level of counsel, it will reconsider – and likely
suspend – such requirements for the foreseeable future.

(Doc. 26-2, "Baechle Dep.," at 52-53).  Plaintiff started in factory production and joined Energizer's Human Resources department in 1976.  (Baechle Dep., at 55).  In November 1999, Plaintiff was promoted to the position of Senior Human Resources Associate.  (Baechle Dep., at 54).  She remained in that position throughout the remainder of her employment with Energizer.

During Plaintiff's tenure with Energizer, employees received yearly performance evaluations pursuant to an employee review program known as "Framework for Achievement" ("FFA"). (Baechle Dep., at 73-74).  As part of the FFA, at the end of each fiscal year, employees completed a self-evaluation and received an annual evaluation from their supervisor.  (Baechle Dep., at 73-74, 100; doc. 26-1, "Steinmetz Dep.," at 37-38).  These evaluations were meant to provide an assessment of the employee's performance over the past year and to outline general expectations for the coming year.  (Baechle Dep., at 73-74).  In addition to providing written comments, the evaluations rated the employee's performance on a scale of "1" to "5," with "5" as the lowest rating and "1" as the highest.  (Baechle Dep., at 83).  Employees also received other performance reviews periodically throughout the year; however, according to Plaintiff, employees only received a numerical rating at the annual FFA evaluation. (Baechle Dep., at 196-97).

Between 1999 and 2004, Plaintiff's supervisor was Human Resources Manager Sue Drath. (Baechle Dep., at 68-69).  Plaintiff testified that Ms. Drath was a "wonderful boss."  (Baechle Dep., at 68).  From 2000 to 2004, Ms. Drath delivered Plaintiff's annual FFA evaluations, and each year she gave Plaintiff a rating of "3," which corresponds with a "Solid Contribution." (Baechle Dep., at 83, 95, 99-100, 141.

In 2004, Ms. Drath was promoted to a position with Energizer's corporate office in St. Louis, Missouri and no longer would be involved with the Human Resources department at the Westlake

-2-

facility.  (Baechle Dep., at 101-02).  Prior to leaving Westlake, Ms. Drath began to transition

management of the Westlake Human Resources group to Scott Steinmetz.  (Baechle Dep., at 103;

Steinmetz Dep., at 20).  As part of this transition, Mr. Steinmetz assisted Ms. Drath in completing

and delivering Plaintiff's 2004 annual FFA review, during which Plaintiff received a rating of "3"

for "Solid Contribution."  In late 2004, Mr. Steinmetz replaced Ms. Drath as Plaintiff's immediate

supervisor.  (Baechle Dep., at 103-04).

As Plaintiff's supervisor, Mr. Steinmetz administered Plaintiff's 2005 and 2006 FFA

evaluations.  (Baechle Dep., at 147, 157).  For each of these years, Plaintiff received a rating of "3"

for "Solid Contribution." Although Mr. Steinmetz identified positive contributions in each of these

reviews, he also identified areas where Plaintiff could improve.  For instance, Mr. Steinmetz wrote

the following as part of Plaintiff's 2006 performance review:

> Many of the tasks Mary Anne is asked to complete are routine tasks that she has been
> involved with for several years.  Expectations of a Senior HR Associate require her
> involvement with more nonroutine and complex tasks.  In 2007, Mary Anne will be
> challenged with projects and tasks that are more complex.  There will be several
> opportunities for her to get involved with more difficult tasks that align with her job
> expectations.

(Doc. 30-15, at 25).

According to Plaintiff, Mr. Steinmetz asked Plaintiff in May 2007 whether she would be

interested in considering an early retirement package.  (Baechle Dep., at 174-76).  Mr. Steinmetz

recalled that it was in fact Plaintiff who approached him regarding the possibility of a severance

package.  (Steinmetz Dep., at 65).  Plaintiff testified that her response to Mr. Steinmetz was "I might

consider it if I wasn't disgraced with bad ratings."  (Baechle Dep., at 176).  Mr. Steinmetz indicated

that he would investigate the possibility of a package and revisit the matter with Plaintiff at a later

point. (Baechle Dep., at 176; Steinmetz Dep., at 65).

In summer 2007, the Westlake Human Resources department underwent significant restructuring.  As part of this reorganization, the Human Resources Manager position was eliminated, which ultimately would result in Mr. Steinmetz's separation from Energizer.  (Steinmetz Dep., at 25-26).  August 17, 2007 was set as Mr. Steinmetz's last day, at which point supervisory responsibilities for the Westlake Human Resources department would fall upon Senior Human Resources Generalists Marlene Hansen and Tim Brown, both aged 46.  (Steinmetz Dep., at 41).  As another part of the restructuring, the Westlake Human Resources Department no longer would report to Director of Human Resources Patty Tingen.  (Doc. 26-8, "Doran Dep.," at 29).  Instead, Ms. Hansen, Mr. Brown, and the rest of Human Resources would report directly to Facility Manager Mark Doran.  (Doran Dep., at 6, 28-29).  In preparation for the restructuring, Ms. Hansen, Mr. Brown, and Mr. Doran spent significant time reviewing Mr. Steinmetz's job functions to determine how best to allocate those duties; Mr. Steinmetz also provided Mr. Doran with information regarding the various Human Resources employees and their respective positions.  (Doran Dep., 38-41).

The record is somewhat unclear as to whether any of the discussions that took place between Mr. Steinmetz and Mr. Doran prior to Mr. Steinmetz's departure concerned the possibility of combining Plaintiff's position with that of another long-standing Energizer employee, Arlene Widdows.  Mr. Doran testified that he did not discuss this possibility with anyone, although he stated, "[t]he only discussion that I was involved in would have been [Mr. Steinmetz] was concerned that Arlene could retire at any point in time and that what would we do if Arlene was to retire." (Doran Dep., at 47).  He claims that they had little, if any, other substantive discussion on the subject.  (Doran Dep., at 47).  However, Mr. Steinmetz testified that he was sure he discussed the

possibility of combining Plaintiff's and Ms. Widdows' positions with Mr. Doran.  (Steinmetz. Dep.,
at 53-54).  Mr. Steinmetz also stated that Mr. Doran had expressed concern over whether Plaintiff
would be able to take on Ms. Widdows' responsibilities in addition to her own if  Energizer were
to combine the two positions.  (Steinmetz Dep., at 54).

Around the same time, Mr. Steinmetz also had discussions with Ms. Tingen and Mr. Doran
about offering Plaintiff an early retirement package.  (Steinmetz Dep., at 49-51).  Mr. Steinmetz
testified that he went to Ms. Tingen and told her about his earlier discussions with Plaintiff regarding
early retirement.  Ms. Tingen told Mr. Steinmetz that she would be willing to look into a package
for Plaintiff if he would provide her with the relevant information.  (Steinmetz Dep., at 50).  Mr.
Steinmetz believes he then told Mr. Doran about his conversation with Ms. Tingen.  (Steinmetz
Dep., at 50-51).

On August 13, 2007, Mr. Steinmetz sent materials to Patty Tingen and Mr. Doran concerning
Plaintiff's position with the company and the possibility of offering Plaintiff an early retirement
package.  (Steinmetz Dep., at 54-55; doc. 30-13, at 1-5).  The materials contained a summary of
Plaintiff's performance evaluations for fiscal years 2004 through 2007 and a proposed calculation
for a severance package.  (Doc. 30-13, at 1-3).  The materials also note that if Ms. Widdows retired,
an opportunity would exist to combine Plaintiff's and Ms. Widdow's positions and to fill the
combined position "with one person with strong time management skills." (Doc. 30-13, at 4).  The
materials conclude with the following recommendation:

> Maryanne is a very devoted colleague.  She gives her best everyday to the job.  She
> has made noticeable improvements in her performance this year and has made
> significant improvement in her understanding of the expectations of the job.  The
> concern is she still must be watched in case she suddenly makes mistakes.

> With the elimination of the Westlake HR Manager position, the department will need to be more dependent of [sic] Maryanne's position and will most likely have less time to oversee her actions.  It is critical that the communication process for this department is well organized and error free.  IT is also important to have a resource in place prior to Arlene [Widdows] electing to retire.  Maryanne will not be able to handle Arlene's responsibilities in addition to her own.

> Recognizing the cost of a severance package, it is recommended that Maryanne be offered a package so that the position can be posted and a replacement can fill the position in time to learn the job accountabilities prior to Arlene retiring.  This also minimizes the efforts required from Tim and Marlene and allows them to focus more on their own accountabilities.

(Doc. 30-13, at 4-5).

On August 16, 2007, Mr. Steinmetz, Mr. Doran, Mr. Brown, Ms. Hansen and Ms. Tingen had a meeting to discuss Plaintiff's performance and the possibility of offering her a severance package.  (Steinmetz Dep., at 54-56). During the meeting, the group decided that Plaintiff was not eligible for a package at that time because her position was not going to be eliminated and there were "not enough issues with performance that warranted issuing a package."  (Steinmetz Dep., at 55).

Mr. Steinmetz believes that he approached Plaintiff late in the day on August 16, 2007 and informed her that Energizer was not going to be able to offer her a package, and that they would need to review her performance before Mr. Steinmetz left the following day.  (Steinmetz Dep., at 61). This would be the only performance evaluation that Mr. Steinmetz would complete in August 2007 prior to leaving Energizer.  (Steinmetz Dep., at 48).

Around 9:00 a.m. on August 17, 2007, Mr. Steinmetz and Mr. Doran sat down with Plaintiff for her performance evaluation.  (Baechle Dep., at 194-95).  Plaintiff found the tone of the meeting to be "very stern, very harsh, [and] very critical."  She felt that Mr. Steinmetz and Mr. Doran focused on trivial issues and overlooked her positive accomplishments.  (Baechle Dep., at 207-09). In

particular, Plaintiff felt that they focused too much on issues such as Plaintiff's mistaken issuance of a funeral announcement that was contrary to a co-worker's wishes, Plaintiff's tardiness at a meeting that she herself had scheduled and organized, and Plaintiff's problems related to the name tents at "Energizer Fundamentals," an orientation program at the Westlake facility for newly hired employees; although Plaintiff acknowledged that she had made these mistakes.  (Baechle Dep., at 59-60, 165-66, 167-70, 283-84).  Plaintiff also felt that the presence of Mr. Doran, whom she testified had never participated in any of her previous performance evaluations, added stress to the situation.  (Baechle Dep., at 203).  During the meeting, Mr. Steinmetz told Plaintiff that she was "currently rated as a three minus,"and that she would be placed on a performance improvement plan if her performance did not improve.  (Steinmetz Dep., at 103).  Because Plaintiff received an overall numerical rating that day, Plaintiff felt that this meeting was her final annual performance evaluation, although there were approximately six more weeks remaining in the fiscal year.  (Baechle Dep., at 196-97).  Plaintiff became very upset during the meeting and at one point had to leave the room to compose herself.  (Baechle Dep., at 199-201).  Plaintiff admits that, as a result of that meeting, she was not terminated, her salary and her benefits were not affected, and she was not demoted or transferred to a different and lower position.  She also acknowledges that she was not placed on a performance improvement plan at that time.

At some point after the meeting, Plaintiff visited Tim Brown's office.  (Baechle Dep., at 221-22).  Plaintiff was "visibly upset."  (Doc. 26-7, "Brown Dep.," at 19).  She told Mr. Brown that she did not understand why she had received a "3-" rating or why she had been threatened with a performance improvement plan.  (Baechle Dep., at 221-22).  According to Plaintiff, Mr. Brown told her that it was because Mark Doran did not like her.  (Baechle Dep., at 221).  Mr. Brown testified

that Plaintiff told him during their discussion that she was "going to leave and retire and not come back." (Brown Dep., at 19).  Plaintiff denies mentioning anything about retirement during this visit with Mr. Brown. (Baechle Dep., at 222-23).  Mr. Brown told Plaintiff that she could take the rest of the day off, but Plaintiff refused.  (Brown Dep., at 19).  Mr. Brown then offered Plaintiff the opportunity to work for the remainder of the day in a vacant office or conference room instead of at her desk, which was in an open area. (Baechle Dep., at 221-22; Brown Dep., at 19).  Plaintiff agreed, and Mr. Brown helped make those arrangements.  (Brown Dep., at 19).

Around 11:25 a.m. Plaintiff called her co-worker, Debbie Maniscalco, to come down and meet her in a human resources conference room to have lunch.  (Baechle Dep., at 69-70, 227-28). Plaintiff told Ms. Maniscalco about her performance review meeting that morning and that she was upset. (Baechle Dep., at 227).  According to Plaintiff, Ms. Maniscalco then said, "you're going to think that this is juvenile but you have 40 years here and you should just leave them flat." (Baechle Dep., at 227-29).  Plaintiff acknowledged that she understood Ms. Maniscalco to mean that Plaintiff should walk out and leave the company.  (Baechle Dep., at 228).  Plaintiff responded, "you're right. I should." (Baechle Dep., at 228).  Ms. Maniscalco then asked Plaintiff whether she should get a box so that Plaintiff could begin packing her things, and Plaintiff said, "okay." (Baechle Dep., at 228).

While Ms. Maniscalco went to find a box, Plaintiff started "scribbling" a note, threw it away, and then wrote another.[2]  The second note indicated that Plaintiff was retiring and taking vacation until the paperwork came through. (Baechle Dep., at 240-41).  Plaintiff also wrote on a sticky-note,

---

[2]Evidently, the first note read was addressed to Ms. Tingen, Mark Doran and Scott Steinmetz and read as follows: "To whom it may concern[:] I am retiring & taking vacation until my final papers come through.  Please let me know the date when you know.  Marion Baechle." (Doc. 30-13, at 24)

"Please pass this along.  Thanks.  Good luck.," and attached it to the note.  (Baechle Dep., at 239-40).  Plaintiff testified during her deposition that the wish of "good luck" on the sticky-note was meant primarily for Mr. Steinmetz because he was leaving the company and starting a new job.  (Baechle Dep., at 240-41).

Plaintiff then placed the note with the sticky-note attached to it, along with her keys and identification badge, on Mr. Steinmetz's desk.  Plaintiff admits that by turning in her identification badge, she would not be able to get into the building without signing in the back and obtaining a temporary pass from the guard.  (Baechle Dep., at 238-39).  She also testified that she could not remember whether she had ever relinquished her badge at any time prior to this instance, but that at times she might have left her keys so that others might have access to certain items while she was gone.  (Baechle Dep., 236-37).  Plaintiff testified that the keys were for her desk, certain doors like "department doors," and for the cash box.  (Baechle Dep., at 231).  She also testified that no one else had a key to the cash box.

Ms. Maniscalco then returned with a box, and Plaintiff packed up some of her personal belongings and threw others away.  (Baechle Dep., at 235).  She also took a safety award that she had received from Energizer off the wall and put it in the garbage.  (Baechle Dep., at 235).  She believes she left some of her belongings there as well.  Ms. Maniscalco then drove Plaintiff home.  (Baechle Dep., at 246).

Plaintiff had a telephone conversation with Tim Brown on the evening of August 17, 2007.  (Baechle Dep., at 246).  Plaintiff testified that during the conversation Mr. Brown told her that she should come back to work while she looked for another job.  (Baechle Dep., at 246-49).  She told him that she was under a great deal of stress and that she could not make any decisions at that time.

(Baechle Dep., at 249).  Mr. Brown, on the other hand, recalled that Plaintiff told him during this conversation that she was "never coming back."  (Brown Dep., at 20).  He testified that he told her he did not think it was a "right" decision, but that he wished her luck if that was what she wanted to do.  (Brown Dep., at 20).

On August 21, 2007, Ms. Hansen met with Mr. Brown and Mr. Doran to discuss the events of the previous week.  (Doc. 26-6, "Hansen Dep.," at 95-96; Brown Dep., at 39-40).  When Ms. Hansen asked what they should do if Plaintiff asked to come back to work, the group concluded that Plaintiff had resigned, and  that Energizer would honor Plaintiff's resignation.  (Hansen Dep., at 99; Brown Dep., at 40).

Plaintiff did not speak to any managers over the weekend or on Monday of the following week.  (Baechle Dep., at 251).  On Tuesday, August 21, 2007, Plaintiff received a telephone call from Ms. Hansen about retirement and the process for getting her pension benefits started.  (Baechle Dep., at 252).  Plaintiff testified that she told Ms. Hansen that she was unable to make any decisions regarding retirement at that time.  (Baechle Dep., at 252-53).  Plaintiff then called Ms. Hansen later that evening to clarify the meaning of a term that Ms. Hansen used in the earlier conversation.  (Baechle Dep., at 254-55).  Plaintiff testified that she asked Ms. Hansen about FMLA leave during one of the August 21 conversations, and that Ms. Hansen told Plaintiff that she was not eligible for FMLA leave because she had retired.  (Baechle Dep., at 256-57).  Plaintiff also called Ms. Hansen at work on August 22, 2007.  During that conversation, Plaintiff stated that she again inquired about FMLA leave, and Ms. Hansen told her at that time that she was ineligible because Defendant had accepted her resignation.  (Baechle Dep., at 256-57).  Plaintiff further testified that Ms. Hansen spoke during that conversation regarding Plaintiff's retirement benefits.

-10-

On the evening of August 22, 2007 Plaintiff called Suzanne Baxter, a nurse at the Westlake facility, at home about going on FMLA leave for depression and anxiety.  (Baechle Dep., at 257-58).  Ms. Baxter told Plaintiff that she was responsible for handling FMLA paperwork and that she would speak to Dr. Paras, who was both the facility's and Plaintiff's personal physician, about it the next day.  (Baechle Dep., at 257).  Plaintiff testified that she waited during the morning for Ms. Baxter to return her call and then called both Ms. Baxter and Dr. Paras in the afternoon on August 22, 2007.  She then went to the Energizer facility to meet with Ms. Baxter about obtaining the FMLA paperwork.  (Baechle Dep., 257-59).

While Plaintiff was at the dispensary speaking with Ms. Baxter on August 23, 2007, Mr. Brown entered the room. (Baechle Dep., at 260). Mr. Brown told Plaintiff that because she was still on the payroll taking vacation, she would be able to take FMLA leave.  (Baechle Dep., at 261).  Mr. Brown also said to Plaintiff, "I want you to know that if you are given this, if you are FMLA approved, when you come off the FMLA we will pay out your vacation and you will be retired." (Baechle Dep., at 261).  Plaintiff further testified regarding Mr. Brown's words to her:

A.    He said that I would be paid out my vacation, my PTO as he called it, and they would hold me to the note and I would be, I would be retired.

Q.    So they were going to follow through exactly how you had written it out on August 17th; right?

A.    That's the indication he gave me.

On August 24, 2007, Plaintiff completed, signed and submitted to Ms. Baxter a "Certification of Health Care Provider Family Medical Leave Act of 1993" form for the purpose of obtaining FMLA leave.  (Baechle Dep., at 262-63).  Dr. Paras also signed the form.

On August 30, 2007, Plaintiff sent a letter to Ms. Hansen stating that she had been very

-11-

emotional following her performance review and that she needed to take some time off.  (Doc. 30-13, at 52).  She planned to remain off work until September 10, 2007, but she "truly look[ed] forward to returning to work once [her] time off ha[d] ended and [she is] feeling better."  (Doc. 30-13, at 52).  She further indicated that despite the note she "scribbled while upset," she had no interest in retiring.  (Doc. 30-13, at 52).  Ms. Hansen responded in a letter dated September 4, 2007 indicating that Plaintiff's resignation had been accepted and that, once she had returned from her medical leave, Energizer would pay out her remaining vacation pay and consider her to be retired.  (Doc. 30-13, at 53).

On September 14, 2007, Plaintiff wrote another letter to Ms. Hansen requesting that her FMLA leave and short term disability benefits be extended until September 24, 2007.  (Baechle Dep., at 290). Plaintiff also requested a certification from her health care provider to substantiate her eligibility for leave during this period.  Plaintiff's request for extended leave was approved and she was notified that she would receive short term disability payments during her leave.  (Baechle Dep., at 291-92).  Sometime thereafter, Plaintiff requested and received extensions of her medical leave through February 2008.  (Baechle Dep., at 292-94).

Plaintiff testified that on September 21, 2007, she saw a vacancy posting for her position on Energizer's website.  (Baechle Dep., at 304, 368).  Plaintiff's email access was eliminated in October 2007.  (Baechle Dep., at 304, 368).  In January 2008, Energizer hired Nicole Thimke to replace Plaintiff as Senior Human Resources Associate.  (Brown Dep., at 69-70; Hansen Dep., at 156).  Ms. Hansen believed Ms. Thimke to be under the age of 30 at the time of hire.  (Hansen Dep., at 157).

Once Plaintiff's extended leave expired, Energizer paid out her remaining vacation hours to her on Energizer's normal payroll schedule until they were exhausted in June 2008.  (Baechle Dep.,

at 306-08).  Plaintiff then elected to begin receiving her retirement benefits.  (Baechle Dep., at 304-06).  Plaintiff filed a charge with the EEOC on May 9, 2008 and subsequently received a notice of Right to Sue.  (Baechle Dep., at 342-44).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the entire record "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing the absence of any such genuine issues of material facts; specifically

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" only if its resolution might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once the moving party has satisfied its burden of proof, the burden then shifts to the non-moving party pursuant to Federal Rule of Civil Procedure 56(e), which states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling on a motion for summary judgment, the court must construe the evidence, as well as any inferences to be drawn from it, in the light most favorable to the party opposing the motion. *See Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 229 (6th Cir. 1990).  The court also

-13-

must determine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson*, 447 U.S. at 249.  In reaching such a determination, however, the court is not to decide disputed questions of fact, but only to determine whether genuine issues of fact exist. *Id.* at 248-49. Moreover, the "trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Circuit 1988).

The Supreme Court has held "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### III.  LAW AND ANALYSIS

#### A.  Age Discrimination

Plaintiff brings claims for age discrimination under both federal and Ohio state laws.  Age discrimination claims brought under Ohio law are analyzed using the same standards as federal claims brought under the ADEA; thus, the court will analyze both claims together. *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005) (citation omitted).  Under the ADEA, a plaintiff may prove a claim of age discrimination using either direct or circumstantial evidence. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998).    Where an employee proceeds on an ADEA claim with circumstantial evidence, the court analyzes the claim using the burden shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972). *Geiger v. Tower Automotive*, 579 F.3d 614, 622 (6th Cir. 2009); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

-14-

Plaintiff's claims are based on circumstantial evidence rather than direct evidence, as she testified that she could not recall anyone at Energizer making derogatory or inappropriate remarks based on her age. (Baechle Dep., at 33-34). Accordingly, the court will use the *McDonnell Douglas* burden shifting framework.

To establish a *prima facie* case of age discrimination under this framework, the employee must show that: (1) the employee was over forty years of age; (2) the employee suffered an adverse employment action; (3) the employee was otherwise qualified for the position; and (4) the employee was replaced by a younger person. *Id.* at *Phelps v. Yale Security, Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993), *cert. denied*, 510 U.S. 86 (1993). If the employee establishes her prima facie case by meeting all of the elements listed above, then the burden shifts to the employer to establish a legitimate, non-discriminatory reason for the employee's termination. *Id.* at 1024. If the employer articulates a legitimate reason for the termination, the burden shifts back to the employee to demonstrate that the employer's articulated reasons were merely pretexts for age discrimination. *Id.*

In this case, the parties do not dispute that Plaintiff was over forty years of age or that she was replaced by a younger person. The parties also do not seriously dispute that Plaintiff was qualified for the position. The question in this case is whether Plaintiff has met the second requirement – i.e., whether Plaintiff has shown that she suffered an adverse employment action. As stated in *Weigold v. ABC Appliance Co.*, 105 Fed. Appx. 702, 2004 WL 1543165 at *5 (6th Cir. 2004):

An adverse employment action is a "materially adverse change in the terms and conditions of . . . employment." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004) (quoting *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). Examples of adverse employment actions include termination of employment, failure to promote, demotion evidenced by decreased

wage or salary, reassignment with significantly different job responsibilities, a material loss of benefits, suspension from employment, and the like. *Smith*, 378 F.3d at 575-76; *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir. 1996). However, a negative criticism or performance evaluation, standing alone, may not constitute an adverse employment action, unless the criticism has an adverse impact on the terms or conditions of employment. *Tuttle v. Metropolitan Government of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007) (internal citations omitted). Similarly, neither a "bruised ego," nor a "mere inconvenience or an alteration of job responsibilities" is enough to constitute an adverse employment action. *White v. Burlington Northern & Santa Fe R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (internal citations omitted). The Sixth Circuit has stated in the context of Title VII, "[i]f every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure." *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999).

Plaintiff argues that she suffered an adverse employment action because Energizer refused to allow her to return to her position after she returned from leave. Defendant argues that Energizer had no obligation to restore Plaintiff to her position following leave because Plaintiff voluntarily resigned on August 17, 2007.

### 1. Voluntary Resignation

An employee cannot claim that she has suffered an adverse employment action if she has voluntarily resigned. *Hammon v. DHL Airways*, 165 F.3d 441, 447 (6th Cir. 1999). Since employment discrimination statutes do not define the term "resignation," this court will look to Ohio common law in analyzing whether Plaintiff voluntarily resigned. *See Hammon*, 165 F.3d at 448.

-16-

Ohio common law recognizes two types of voluntary resignation: "constructive" and "effective." An employee can constructively resign either "(1) by failing to comply with his employer's written request requiring him to take a certain action;" or "(2) by constructively abandoning his position, that is, by failing to report to work for a substantial period of time." *Id.* (internal citations omitted).  To effectively resign, in contrast, an employee must take two steps: (1) the employee must express an intention to end her employment; and (2) the employee must take some action indicating that she is relinquishing the position. *Id.* at 448-49.  The employee need not take both steps at the same time to effectively resign; however, she must do both before the effective resignation is complete. *Id.* at 448.

The parties appear to agree that the circumstances necessary to establish constructive resignation are not at play here.  However, Defendant argues – and Plaintiff disputes – that Plaintiff completed the steps necessary for an effective resignation.  The court addresses these arguments below.

### a.  Intent to End Employment

As stated above, the first step an employee must take to complete an effective resignation is to express an intention to end her employment.  It is undisputed that on August 17, 2007, following a performance evaluation, Plaintiff had a conversation with her co-worker, Ms. Maniscalco, during which Ms. Maniscalco said to Plaintiff, "you're going to think that this is juvenile but you have 40 years here and you should just leave them flat." (Baechle Dep., at 227-29).  Plaintiff understood Ms. Maniscalco to mean that Plaintiff should walk out and leave the company, and she responded, "you're right.  I should." (Baechle Dep., at 228).  Plaintiff then wrote a note and placed it, along with her keys and identification badge, on her supervisor's desk.  The note indicated that Plaintiff

was retiring and taking vacation until the paperwork came through.  Plaintiff also wrote a sticky-note, which read: "Please pass this along.  Thanks.  Good luck." and attached it to the note.  (Baechle Dep., at 239-40).

Plaintiff argues that "[a]lthough the note expresses an intention to retire, when the facts are viewed in a light most favorable to Baechle as the non-movant, it is clear that the note did not effectuate a formal retirement, nor did Baechle resign."  (Doc. 29, at 7).  In support of this argument, Plaintiff points to Energizer's Retirement Procedures, which, according to Plaintiff, outline steps that employees must take in order to effectuate retirement.  These steps include deciding on a date and notifying one's supervisor of the intent to retire and the proposed retirement date.  (Doc. 30-13, at 33).  Plaintiff also points to Marlene Hansen's testimony for the proposition that an employee must provide a date before he or she can retire.  However, Plaintiff's characterization of Ms. Hansen's testimony is incomplete.  Ms. Hansen testified:

> Q.    If somebody is pension eligible and they wish to retire, they don't merely walk out the door and leave their keys; isn't that correct?  There are certain steps they have to complete.
>
> A.    They have to provide a date.
>
> Q.    Okay.
>
> A.    I guess they don't have to provide a date but they, you know, indicate their intent to retire or to resign, either way.
>
> Q.    In order to become eligible to receive pension checks, doesn't an employee have to complete certain paperwork?
>
> A.    To commence pension benefits?
>
> Q.    Yes.
>
> A.    Yes.

(Hansen Dep., at 101).  Although Ms. Hansen first states that "[t]hey have to provide a date" in response to counsel's question regarding the steps that employees who are "pension eligible" and "wish to retire" must take, she then states, "*I guess they don't have to provide a date* but they, you know, indicate their intent to retire or resign, either way." (Hansen Dep., at 101) (emphasis added). Ms. Hansen then states that employees have to complete certain paperwork to commence pension benefits.  Contrary to Plaintiff's suggestion, this testimony, viewed as a whole, does not reflect that Energizer employees who wish to retire "have to provide a date." (Hansen Dep., at 101).

Plaintiff also notes throughout her filings that she never used the word "resign," but only the word "retire." To the extent that Plaintiff argues in repeatedly making this distinction that she could not have voluntarily resigned because she never used the words "resign" or "resignation," the court finds little merit to such an argument.  As explained above, in determining whether an employee has effectively resigned, courts analyze "whether the employee *expressed an intention to end his employment*, and whether the employee took action to relinquish his position." *Hammon*, 165 F.3d at 448 (emphasis added).  The first prong of this analysis does not focus on particular words or phrases, but rather, on if the employee communicated an intention to "end his employment." Whether an employee expresses an intent to "resign" or to "retire," the effect is the same: the employee has expressed a desire that his or her employment come to an end.  Furthermore, Plaintiff has not cited – and the court has not found – any case law suggesting that an employee's use of the word "retire" versus the word "resign" alters in any way the analysis outlined above.

As Plaintiff herself concedes, the note she left on her supervisor's desk "*expresses an intent to retire*." (Doc. 29, at 7) (emphasis added).  The sticky note included with the note instructs Mr.

Steinmetz to pass the note along and expresses wishes of good luck.  Just before Plaintiff took these steps, Ms. Maniscalco told Plaintiff, " . . . you should leave them flat," and Plaintiff responded "you're right.  I should."  (Baechle Dep., at 227-29).  In analyzing whether an employee has taken the steps necessary to effectively resign, the court must look at "objective manifestations of an employee's intent rather than evidence of subjective intent." *Pownall*, 63 Fed. Appx. at 822.  Based on the undisputed facts, the court concludes that Plaintiff sufficiently expressed an intent to end her employment.

### b.  Action Relinquishing Position

Plaintiff further argues that she did not complete the second step necessary for effective resignation because her actions on August 17, 2007 fail to demonstrate that she was relinquishing her position.  Plaintiff claims that, rather, "her actions consistently showed Energizer that she intended to do nothing more than take time off to sort through the emotional issues created during the August 17, 2007 review by Energizer and then return to work."  (Doc. 29, at 6).  Plaintiff makes several arguments in support of this claim.  First, Plaintiff states that although she left her keys at work on August 17, 2007, she did so only because they contained the only available key to the cash box, and she did not want to inconvenience anyone while on leave.  Plaintiff also states that although she took some of her personal effects with her that day, she also left some of her belongings behind, and that when she attempted to get some make-up she had left, she received a box full of items, some of which were not even hers.  Plaintiff further claims that she did not fail either to "attempt to fulfill the obligations of her position" or to contact her employer regarding her intent to return following leave, as she made several attempts to speak with Ms. Hansen and Mr. Brown following the events of August 17, 2007 and sent a letter to Ms. Hansen on August 30, 2007 expressly indicating her

desire to return to work.  (Doc. 29, at 9).

However, the court finds that all of these arguments are unavailing because Plaintiff's actions on August 17, 2007 "sufficiently confirmed [her] intention to sever the employment relationship." Hammon, 165 F.3d at 449.  In making this determination, the court again notes that it must "consider[] the objective manifestations of an employee's intent rather than evidence of subjective intent" in determining whether an employee has effectively resigned. Pownall v. City of Perrysburg, 63 Fed.Appx. 819, 822 (6th Cir. 2003).  Although Plaintiff claims that she left behind her keys because they contained a key to the cash box that no one else had, there is nothing in the record to suggest that Plaintiff articulated this explanation to anyone at Energizer.  Rather, the evidence reflects only that Plaintiff left her keys and identification badge on her supervisor's desk, along with a note indicating that she was retiring and taking vacation until the paperwork came through. Incidentally, Plaintiff could not recall having left behind her identification badge on any previous occasion and acknowledged that, without her badge, she would have to sign in at the back and obtain a temporary pass in order to enter the Westlake facility.  Plaintiff's explanation that she did not want to inconvenience anyone while on leave also is somewhat curious because at that point she had not yet even spoken with anyone about going on leave, let alone had that request approved.

Plaintiff also points out that she left some of her belongings behind on August 17, 2007. However, this fact does little to aid Plaintiff's claim because the second step of the effective resignation analysis does not require that an employee comprehensively clean out her desk; it requires only that an employee take some action indicating that she is relinquishing her position. Ultimately, it is undisputed that on August 17, 2007 Plaintiff: (1) wrote a note indicating that she was retiring and taking vacation until the paperwork came through; (2) put the note, along with her keys

and identification badge, on her supervisor's desk with instructions to pass the note along; (3) packed up some of her personal effects in a box; (4) discarded other items, including an award given to her by Energizer; and (5) left the Westlake facility at approximately 12:30 p.m., several hours before the end of the workday.  When viewed collectively, these undisputed facts are sufficient to establish that Plaintiff effectively resigned her employment on August 17, 2007.

Plaintiff's remaining arguments concern events that took place after August 17, 2007.  For instance, Plaintiff notes that, while on leave, she asked a co-worker to gather some of her makeup for her and that she received in response a "whole box of stuff . . . Sweaters, things that weren't even mine, as a matter of fact.  Just a bunch of stuff in a box."  (Baechle Dep., at 233, 250-51).  Plaintiff claims that "[t]his action by Energizer was an attempt to push [Plaintiff] out the door, and bolster their argument that [Plaintiff] took all of her belongings when she went on leave."  (Doc. 29, at 8).  This argument is unpersuasive for several reasons.  As explained above, Plaintiff need not have taken all of her belongings with her on August 17, 2007 to have effectively resigned.  Furthermore, although Plaintiff claims that sending her a box with "a bunch of stuff" constituted "an attempt to push her out the door," Plaintiff made the request to her co-worker and received the box after she already had effectively resigned.  Thus, any alleged attempt on the part of Energizer to "push [Plaintiff] out the door" at this point was unnecessary, as Plaintiff had already effectively walked out on her own.

Plaintiff's arguments that she "attempted to fulfill the obligations of her position" and that she did not "fail to contact her employer" during leave are similarly misplaced.  *See* doc. 29, at 9-10.  All the evidence that Plaintiff submits in support of these arguments consists of interactions that Plaintiff allegedly had with Energizer personnel after August 17, 2007.  As explained above, Plaintiff

-22-

completed both steps necessary for an effective resignation on that date.  Therefore, interactions that Plaintiff and Energizer allegedly had after August 17, 2007 are largely irrelevant to the court's effective resignation inquiry.

The fact that Plaintiff's voluntary resignation was in some sense prospective does not alter the court's analysis.  *See* *Pownall*, 63 Fed.Appx. at 822 (distinguishing *Davis v. Marion County Engineer*, 60 Ohio St.3d 5*3, 573 N.E.2d (1991), wherein the court held that a civil service employee could withdraw a prospective resignation before its effective date so long as the employer had not formally accepted the resignation, and finding that the plaintiff, who was not a civil service employee and who had taken the steps necessary under Ohio common law to effectively resign, had no ability to revoke the resignation after the fact).  In this case, Plaintiff's expressed intent was to retire once the paperwork came through, and she took action to indicate that she was relinquishing her position. Unlike the plaintiff in Davis, Plaintiff was not a public employee protected by Ohio's civil service laws, and Defendant had no obligation to hold open Plaintiff's position after she had taken the steps necessary for an effective resignation, just in case she happened to change her mind.  *See* *Pownall*, 63 Fed. Appx. at 82*3 (finding that once the plaintiff had taken the steps necessary for an effective resignation, the plaintiff had no right to revoke her resignation and the employer had no duty to reinstate her).

Because she effectively resigned, Plaintiff cannot show that she suffered adverse employment action, unless she can establish the elements for a constructive discharge, as explained more thoroughly below.

## 2. Constructive Discharge

Generally, employee "resignations and retirements are presumed to be voluntary." *Nunn v. Lynch*. 113 Fed.Appx. 55, 59 (6th Cir. 2004).  However, an apparently voluntary resignation may rise to the level of constructive discharge if it was "objectively reasonable for the employee to leave under the circumstances." *Id.*  In her complaint, Plaintiff alleges that she was "constructively terminated" because of her age. (Doc. 18, at ¶ 14).  In further explanation of this allegation, Plaintiff claims that she "was forced to take an early retirement upon [Energizer's] threat to terminate her employment," and/or that she effectively retired following "Energizer's refusal to return her to service following a short term disability and FMLA leave . . . effective 4, 2008." (Doc. 18, at ¶ 14).

To show that she suffered a constructive discharge, a plaintiff must demonstrate that: (1) "the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person;" and (2) the employer did so "with the intention of forcing the employee to quit . . . ." *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001) (quoting *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)).  "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Moore*, 171 F.3d at 1080.  Essentially, an employee has suffered a constructive discharge if the "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Yates v. Avco Corp.*, 819 F.2d 630, 636-37 (6th Cir. 1987).  The presence of the following factors, either singly or in combination, are relevant to the analysis of whether a reasonable person would have felt compelled to resign: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment or humiliation by the employer designed

-24-

to encourage the employee's resignation; (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Logan*, 259 F.3d at 568.  However, events such as criticism in performance reviews or placement on a performance improvement plan, without more, do not constitute objectively intolerable conditions. *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002).

Plaintiff's assertion in her complaint that she was constructively terminated in or about June 2008 when Energizer failed to return her to her previous position following FMLA leave is unpersuasive.  As explained above, the undisputed facts show that Plaintiff effectively resigned on August 17, 2007.  Once Plaintiff's resignation took effect, Plaintiff had no right to revoke it and Energizer had no duty to reinstate her. *See Pownall*, 63 Fed.Appx. at 823.  Thus, Energizer's refusal to reinstate Plaintiff in or about June 2008 did not constitute a constructive discharge.[3]

Based on the above, the court finds that Plaintiff has failed to establish that she suffered an adverse employment action.  Thus, Plaintiff has failed to make out a prima facie case of age discrimination under either the ADEA or Ohio state law.[4]

---

[3]Defendant argues in its motion for summary judgment that Plaintiff was not constructively discharged on August 17, 2007.  Although Plaintiff devotes significant space in her statement of facts to the events leading up to the August 2007 performance review and other evidence that might bear upon whether Plaintiff was constructively discharged on August 17, 2007, Plaintiff does not assert in either her first amended complaint or her opposition to the motion for summary judgment that she was constructively discharged on that date.  Thus, the court must assume that she intends to concede the point, and the court need not address that issue here.

[4]Because the court finds that Plaintiff's claims for age discrimination must fail on the merits, the court need not address the parties' arguments regarding whether Plaintiff's state law claims are barred by the 180-day statute of limitations. *See Ohio Rev. Code § 4112*.

**B. FMLA Interference**

Plaintiff also brings a claim for FMLA interference under 29 U.S.C. § 2615(a)(1).  To prove a claim for FMLA interference, a plaintiff must show that: (1) she is an "eligible employee;" (2) the defendant is an "employer" as defined by the FMLA; (3) the employee was entitled to take FMLA leave; (3) the plaintiff gave the defendant notice of her intention to take leave; and (5) the defendant denied the plaintiff FMLA benefits to which she was entitled.  *Verhoff v. Time Warner Cable, Inc.*, 299 Fed.Appx. 488, 495-96 (6th Cir. 2008) (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)).  The parties in this case do not dispute that Plaintiff has satisfied the first four of these elements; their dispute turns on whether she has satisfied the fifth – i.e., whether Energizer improperly denied Plaintiff FMLA benefits to which she was entitled.

Plaintiff claims that she has established the fifth element because Energizer failed to restore her to her previous position or an equivalent position following her return from leave.  Energizer claims that it was not obligated to restore Plaintiff to her previous position or any other because Plaintiff had effectively resigned prior to taking FMLA leave.  According to Defendant, the only reason why Plaintiff was granted FMLA leave is because Plaintiff still was on the payroll receiving vacation pay at the time of her request.

Under the FMLA, an employee has the right not only to take up to twelve weeks of leave, but also "to be restored by the employer to the position of employment held by the employee when the leave commenced."  29 U.S.C. § 2614(a)(1)(A).  Section 2614(a) of the FMLA provides:

(a)      Restoration to position.

(1)      In general

         Except as provided in subsection (b) of this section, any eligible employee

-26-

who takes leave under section 2612 of this titled for the intended purpose of the leave shall be entitled, on return from such leave –

(A)    to be restored by the employer to the position of employment held by the employee when the leave commenced; or

(B)    to be restored to an equivalent position with the equivalent employee benefits, pay, and other terms and conditions of employment.

However, the right to restoration set forth above is not absolute.  Section 2614(a) further provides:

(3)    Limitations

Nothing in this section shall be construed to entitle any restored employee to

*****

(B)    any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.

Pursuant to these sections, "[a]n employee returning from FMLA leave is not entitled to restoration unless he would have continued to be employed if he had not taken FMLA leave." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004).  For the reasons stated above, the court finds that the undisputed facts show that Plaintiff effectively resigned on August 17, 2007.  Once Plaintiff's voluntary resignation took effect, Plaintiff had no right to revoke it and Energizer had no duty to reinstate her.  *See Pownall*, 63 Fed.Appx. at 823.  Since Plaintiff resigned prior to requesting and beginning FMLA leave, Plaintiff "would not have continued to be employed if [s]he not taken FMLA leave," and nothing in the FMLA required Energizer to restore her to her previous position upon her  return from leave.  Thus, Plaintiff's claim for FMLA interference must fail.

-27-

**Conclusion**

For the reasons set forth above, Defendant's motion for summary judgment (doc. 21) is

GRANTED.

IT IS SO ORDERED.

                                       s/Kenneth S. McHargh
                                       Kenneth S. McHargh
                                       United States Magistrate Judge

Dated: June 9, 2010.